UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

USI INSURANCE SERVICES LLC

　　　　Plaintiff,

　　v.

SOUTHEAST SERIES OF
LOCKTON COMPANIES, LLC,

　　　　Defendant.

CIVIL ACTION NO.

1:20-CV-2490-SCJ

**O R D E R**

This is a lawsuit between two competing insurance brokerage firms based on the departure of three employees who left the employ of Plaintiff USI Insurance Services LLC ("USI") to go to work for Defendant Southeast Series of Lockton Companies, LLC ("Lockton"). USI filed the lawsuit and asserted claims for tortious interference with contractual and business relations and sought compensatory and punitive damages plus attorney's fees [1]. Lockton filed counterclaims against USI and alleged tortious interference with contractual and business relations and deceptive trade practices. In addition to compensatory and punitive damages, Lockton sought attorney's fees and injunctive relief.

Currently pending are Lockton's Motion for Summary Judgment [116] as to USI's claims against it as well as USI's Motion for Summary Judgment [119] as to Lockton's counterclaims against it. USI also moves for partial summary judgment as to liability with regard to its claims against Lockton. Also pending are Lockton's unopposed Motion for Leave to File Supplemental Authority [169] and USI's Motion for Leave to File a Surreply [172].

## I.   Background

In 2017, USI purchased all issued and outstanding equity interests of Wells Fargo Insurance Services USA, Inc. ("WFIS"). Plt.'s Stmt. of Material Facts ("PSOMF") ¶2 [120].[1] WFIS was renamed USI Insurance Services National, Inc. ("USIN"), then merged into USI Insurance Services LLC (Plaintiff in this lawsuit). *Id.* According to USI, it is the successor-in-interest

---

[1] Citations that reference only one parties' Statements of Material Facts refer to statements that are not disputed. Pursuant to the Local Rules of this Court, each of the proponent's facts will be deemed admitted unless the respondent "(i) directly refutes the [proponent's] fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the [proponent's] fact; or (iii) points out that the [proponent's] citation does not support the [proponent's] fact or that the [proponent's] fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1)." LR 56.1B(2)(a)(2) NDGa. Where a factual assertion or portion thereof is properly disputed, the Court will cite directly to evidence from the record that supports the Court's factual recitation.

to WFIS/USIN. First Allen Decl. at ¶13 [131-1].[2] At the time of the stock purchase and sale agreement, Dean Anderson, Taylor Anderson, and Roger Maldonado (collectively the "Former Employees") were employed by USI. DSOMF ¶3 [117-1].

Dean Anderson and Taylor Anderson executed employment agreements (the "DA Agreement" and "TA Agreement," respectively) when employed by WFIS, which subsequently applied to their employment with USI. PSOMF

---

[2] The Court notes that, rather than actually responding to 203 of USI's 289 Statements of Material Fact, Lockton incorporated by reference the responses Maldonado and the Andersons made to similar statements in *Anderson v. USI*, No. 1:19-CV-5582-SCJ (the "Related Action"). This incorporation by reference is non-sensical in many instances. For example, in multiple responses Lockton incorporated by reference, there is an objection to materiality on the grounds that Lockton is not a party to the lawsuit. *See* Plts.' Resp. to Def.'s Stmt. of Material Facts at ¶¶ 69, 72, 73, *Anderson v. USI*, No. 1:19-CV-5582-SCJ [254]. However, Lockton <u>is</u> a party to the instant lawsuit. The Court find these shortcuts taken by counsel for Lockton to be disingenuous. Nevertheless, the Court has painstakingly sifted both sets of responses for supportable disputes or objections. With respect to the status of USI as the successor-in-interest to WFIS, Lockton has incorporated by reference the response to USI's statement filed by Maldonado and the Andersons in the related case. Def.'s Resp. to Plts.' Stmt. of Material Fact at ¶ 2 [136]. In that case, Maldonado and the Andersons objected to Robert Allen making this legal conclusion because he is not a lawyer. Nevertheless, Allen, in his capacity as Property & Casualty Leader in the Atlanta office of USI, offered a detailed description of how USI evolved from WFIS as set forth above. His declaration statements are sufficient for the Court to conclude that USI is the successor-in-interest to WFIS/USIN. Thus, to the extent that Lockton adopted the objection set forth by the plaintiffs in the Related Action, the objection is OVERRULED.

¶¶7, 31 [120]. Upon the closing of the purchase agreement between WFIS and USI, Roger Maldonado, accepted an at-will position as Senior Vice President in USI's National Aviation Practice Group working out of USI's office in Atlanta, Georgia. PSOMF ¶22 [120]. Maldonado agreed to certain terms and conditions, which are contained in a written agreement ("RM Agreement"). *Id.*

## A. Specific Terms of the Employment Agreements

All three employment agreements contain the following terms:

- "Active Prospective Client" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of [Executive's/Producer's/Employee's] employment hereunder.
- "Client Account" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.
- "Competitive Business" means any Person engaged in the production, distribution, marketing, or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.
- "Competitive Product" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which [Executive/Producer/Employee] or the Company has sold, marketed,

distributed or developed in the last two (2) years of [Executive's/Producer's/Employee's] employment with the Company, or about which [Executive/Producer/Employee] has acquired Confidential Information.

- Purpose of Restrictions. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from [Executive's/Producer's/Employee's] knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. [Executive/Producer/Employee] agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

- Modification. If a court finds that any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

- No Ownership Rights to Client Accounts. [Executive/Producer/Employee] represents and warrants to the Company that [Executive/Producer/Employee] has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

- Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

PSOMF ¶¶45, 46, 47, 48, 49, 50, 51, 52 [120].

## 1. Terms of Dean Anderson's Agreement

Dean Anderson was Senior Vice President, National Practice Leader—Aviation for USI. PSOMF ¶4 [120]. Section 8.2 of the DA Agreement (the "DA Notice Provision") provides:

Termination by Executive. Executive may terminate Executive's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Executive's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Executive to cease performing any services hereunder until the termination of employment.

PSOMF ¶8 [120].

Section 2.3 of the DA Agreement provides:

Duty of Loyalty. Executive acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

PSOMF ¶9 [120].

Section 2.2 of the DA Agreement provides:

No Conflicts of Interest. During Executive's employment hereunder, Executive agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Executive's employment with the Company. Executive agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

PSOMF ¶10 [120].

Section 7.5 of the DA Agreement (the "Non-Compete Covenant") provides:

Non-Competition. In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees, during the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, directly or indirectly, compete with the Company within the Geographic Area by: (a) acting in Executive's same or similar capacity, which Executive acted for the Company, on behalf of any Competitive Business; (b) performing Executive's same or similar functions, which Executive performed for the Company, on behalf of any Competitive Business; or (c) otherwise taking, facilitating or encouraging any action to evade or attempt to evade the intent of this Section; provided, however, that in the event Executive's employment hereunder is terminated by the Company without Cause within twelve (12) months following the Effective Date, then the restrictions in this Section 7.5 (Non-Competition) shall be void and of no further force or effect. "Restricted Geographic Area" means each of the following separate and divisible geographic areas: (a) the state in which Executive maintained his/her principal office for the Company during the last twelve (12) months of Executive's employment hereunder; (b) a one hundred (100) mile radius from any Company facility in which Executive maintained an office during the last twelve (12) months of Executive's employment hereunder; (c) any territory to which Executive has been assigned during the last twelve (12) months of Executive's employment hereunder; and (d) any area in the United States where the Company has conducted USI Business during the last twelve (12) months of Executive's employment hereunder. Notwithstanding the foregoing, in the event that (i) Executive terminates Executive's employment hereunder pursuant to Section 8.2 (Termination by Executive) within twelve (12) months following the Effective Date (a "Voluntary Termination Event") and (ii) the Company does not, within fifteen (15) business days of the Company's receipt of Executive's notice of termination (the "Election Period"), notify Executive of the Company's election to enforce this Section 7.5 (Non-Competition), then, following the later of (1) the effective date of such Voluntary Termination Event or (2) the end of the Election Period, this Section 7.5 (Non-Competition) shall be void

and of no further force or effect. For the avoidance of doubt, any such election shall remain fully enforceable against Executive and Executive shall be entitled to the payments set forth in Section 8.3(F). Also, for the avoidance of doubt, the covenants set forth in this Section 7.5 shall remain in force for any termination hereunder, except as expressly stated in this Section 7.5.

PSOMF ¶12 [120].

Section 7.6 of the DA Agreement (the "Client Non-Compete Covenant")

provides:

Non-Competition of Client Accounts. During the Term and for (2) years after Executive is no longer employed hereunder, for any reason, Executive shall refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Restricted Geographic Area. "Carrying on any business in competition with the Company" shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Executive had a role in the sale, marketing, distribution, or development in the last two (2) years of Executive's employment with the Company or about which Executive acquired Confidential Information. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Executive of stock or other securities of a publicly-held corporation in which Executive (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

PSOMF ¶14 [120].

Section 7.7 of the DA Agreement (the "DA Non-Solicitation Covenant")

provides:

Non-Solicitation of Clients and Active Prospective Clients. In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees that:

(a) During the Term and for two (2) years after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Executive managed or regularly serviced and/or about which Executive obtained Confidential Information on behalf of the Company within the last two (2) years of Executive's employment hereunder.

(b) During the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Executive solicited and/or about which Executive obtained Confidential Information on behalf of the Company within the last six (6) months of Executive's employment hereunder.

PSOMF ¶15 [120].

## 2. Terms of Roger Maldonado's Agreement

Section 4.5 of the RM Agreement (the "RM Non-Solicitation Covenant")

provides:

> Non-Solicitation of Clients and Active Prospective Clients. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:
>
> (a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.
>
> (b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide

services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

PSOMF ¶24 [120].

### 3. Terms of Taylor Anderson's Agreement

Section 8.2 of the TA Agreement (the "TA Notice Provision") provides:

Termination by Producer. Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

PSOMF ¶32 [120].

Section 2.4 of the TA Agreement provides:

Duty of Loyalty. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

PSOMF ¶33 [120].

Section 2.3 of the TA Agreement provides:

No Conflicts of Interest. During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of

interest concerning Producer's employment with the Company. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

PSOMF ¶34 [120].

Section 7.5 of the TA Agreement (the "TA Non-Solicitation Covenant")

provides:

Non-Solicitation of Clients and Active Prospective Clients. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any

> Active Prospective Client; (iii) consult for any Active Prospective
> Client with respect to services in competition with the Company;
> or (iv) sign a broker of record letter with any Active Prospective
> Client to provide services in competition with the Company; in
> each case with respect to any Active Prospective Client that
> Producer solicited and/or about which Producer obtained
> Confidential Information on behalf of the Company within the
> last six (6) months of Producer's employment hereunder.

PSOMF ¶35 [120].

## B. Communications between the Former Employees and Lockton

Like USI, Lockton is involved in providing risk management and

insurance brokerage services. Def.'s Stmt. of Material Facts ("DSOMF") ¶1

[142]. In June 2019, Manoj Sharma, Executive Vice President and Chief

Operating Officer of Lockton, contacted Taylor Anderson. PSOMF ¶57 [120].

After a lunch meeting with Sharma, Taylor Anderson emailed him a copy of

his employment agreement with USI. PSOMF ¶¶ 58, 59 [120]. Sharma

forwarded that agreement to Lockton's attorneys for review. PSOMF ¶59

[120]. On July 3, 2019, Sharma texted Taylor Anderson to tell him that the

next step would be to discuss deal terms. PSOMF ¶ 60. On August 23, 2019,

Sharma emailed Taylor Anderson an offer of employment that included an

annual salary and sign-on bonus plus indemnity in the event of litigation by

USI. PSOMF ¶61 [120]. On October 7, 2019, Hiram Marrero, the Regional

Executive Officer for the Lockton Companies, the parent entity of Lockton,

asked Sharma to arrange a dinner with Taylor Anderson; Sharma responded affirmatively and told Marrero that they needed "to get Taylor hooked emotionally" with Lockton. PSOMF ¶ 63 [120]. On October 26, 2019, Sharma sent Marrero a text message asking him to review the numbers for compensation of Taylor Anderson, Dean Anderson, and Maldonado. PSOMF ¶64 [120]. On October 27, Sharma emailed Taylor Anderson updated terms of an employment offer with Lockton; those terms included an indemnity by Lockton in the event USI made claims against Taylor Anderson. PSOMF ¶65 [120]. On October 28, 2019, Sharma sent Taylor Anderson a formal offer letter, non-disclosure agreement, and benefits summary. *Id.* A revised offer letter was sent three days later with modifications to the sign-on bonus. PSOMF ¶67 [120]. On November 1, 2019, Taylor Anderson accepted the offer. PSOMF ¶68 [120]. On December 2, 2019 and again on December 8, 2019 Sharma sent Taylor Anderson revised offer letters, increasing his sign-on bonus from $1.5 million to $1.57 million. PSOMF ¶71.

Having learned from Taylor Anderson that others in USI's aviation practice were interested in employment opportunities, Sharma contacted Dean Anderson and Maldonado. PSOMF ¶ 72 [120]. During a lunch meeting, Taylor Anderson and Maldonado inquired whether Dean Anderson was interested in employment with Lockton. PSOMF ¶73 [120]. Sharma called

Dean Anderson at USI on October 11, 2019 and soon after sent him a draft of terms for an employment offer. PSOMF ¶74 [120]. Dean Anderson met with Sharma and Lockton's CEO, Douglas Hutcherson, at Lockton's office on October 14, 2019. PSOMF ¶75 [120]. As Taylor Anderson did, Dean Anderson shared a copy of his USI employment agreement with Sharma. PSOMF ¶ 76 [120]. When Dean Anderson told Lockton he could not work for it in Georgia due to constraints in his USI employment agreement, Sharma told him that he could work for Lockton in Charlotte or Florida. PSOMF ¶¶77, 78 [120].

On October 27, 2019, Sharma sent Dean Anderson an email containing the draft terms of an employment offer. PSOMF ¶79 [120]. Two days later, Sharma sent a revised offer to Dean Anderson that included an annual salary, a potential bonus structure, and an indemnity provision. PSOMF ¶81 [120]. The bonus structure for Dean Anderson  included consideration of revenue generated clients. PSOMF ¶82 [120]. Dean Anderson accepted the revised employment offer via text message. PSOMF ¶83 [120]. Dean Anderson received a formal offer letter dated October 31, 2019 reflecting the terms agreed to, including indemnification by Lockton. PSOMF ¶84 [120]. Dean Anderson and Sharma met with Wit Hall, a lawyer referred to by Sharma as "our lawyer." PSOFM ¶86 [120].

After receiving a phone call from Sharma, Maldonado set up an in-person meeting on September 4, 2019. PSOMF ¶89 [120]. At Sharma's request, Maldonado emailed Sharma his employment agreement with USI. PSOMF ¶91 [120]. On October 25, 2019, Sharma asked Maldonado to meet with Hall—again referred to by Sharma as "our lawyer." PSOMF ¶92 [120]. At a meeting between Maldonado, Hall, and Sharma, Maldonado's contractual obligations to USI were discussed. PSOMF ¶93 [120]. On October 27, 2019, Sharma sent Maldonado an email containing draft employment terms. PSOMF ¶94 [120]. Those terms stated that Maldonado would have the title of Senior Vice President, Producer Member, Southeast Series of Lockton Companies, LLC and would receive an annual pre-tax draw of $325,000, a $50,000 sign-on bonus, and commission percentages. PSOMF ¶95 [120]. In addition, Lockton agreed to indemnify Maldonado in the event of litigation with USI "subject to contingencies such as [his] compliance with the advice of [Lockton's] counsel and [his] continued membership with the [Lockton] Series." PSOMF ¶96 [120]. Maldonado admitted that he anticipated the potential for such litigation. PSOMF ¶97 [120].

On October 28, 2019, Sharma sent Maldonado a follow-up email increasing the sign-on bonus to $65,000. PSOMF ¶98 [120]. On the same day, Sharma emailed Maldonado an offer letter, non-disclosure agreement, and

benefits summary. PSOMF ¶99 [120]. On November 1, 2019, Maldonado signed the offer letter while at a meeting in Lockton's offices. PSOMF ¶100 [120].

### C. Lockton's Awareness of the Restrictive Covenants

Lockton reviewed employment agreements of new hires such as the Former Employees to, among other things, learn whether the recruit was subject to a non-compete or non-solicit provision and when and how a recruit could resign from their old employer. PSOMF ¶101 [120]. Lockton's counsel regularly met with new hires to "advise them on their rights and responsibilities pre-resignation, resignation, post-resignation" and so the new hires could "answer any questions that . . . counsel would have about their employment contract." PSOMF ¶102 [120]. Prior to making an official offer to Maldonado, Lockton was aware of the terms of his employment agreement with USI, including the noncompete and non-solicitation provisions. PSOMF ¶103 [120]. Prior to making an official offer to Taylor Anderson, Lockton was aware of the terms of his employment agreement with USI, including the noncompete, non-solicitation, and notice provisions. PSOMF ¶104 [120]. Prior to making an official offer to Dean Anderson, Lockton was aware of the terms of his employment agreement with USI, including his non-compete, non-solicitation, and notice provisions. PSOMF ¶105 [120]. Sharma was

17

specifically aware of Dean and Taylor Anderson's notice provisions. PSOMF ¶106 [120]. Sharma acknowledged that the Andersons' failure to comply with their notice provisions would be disruptive to USI. PSOMF ¶107.

### D. Lockton's Agreement to Indemnify

The indemnification agreements between Lockton the Former Employees covered legal fees as well as any damages for which the Former Employees are found liable. PSOMF ¶109 [120]. The Former Employees paid nothing in relation to the lawsuit against them; nor did they receive a bill for attorney's fees. PSOMF ¶111 [120].

### E. Interaction with Counsel

Sharma met with attorneys from Hall, Gilligan, Roberts, & Shanlever LLC ("HGRS"), acting as counsel for Lockton, at least three times and had several phone calls with them prior to the resignation of Maldonado and the Andersons from USI. PSMOF ¶113 [120]. Lockton was aware of potential for litigation if it hired Maldonado and the Andersons. PSOMF ¶120 [120].

Lockton introduced Maldonado and the Andersons to Hall and HGRS for the purpose of providing legal advice concerning their potential departure from USI to Lockton. PSOMF ¶119 [120]. Hall and HGRS were present at meetings in the capacity as counsel to Lockton and counsel to Maldonado and the Andersons. PSOMF ¶ 114 [120]. The purpose of these meetings was to

18

obtain legal advice concerning Maldonado's and the Andersons' impending departure from USI and arrival at Lockton. PSOMF ¶115 [120]. Lockton paid Hall and HGRS legal fees for representing Maldonado and the Andersons, including their time in attending all meetings with them. PSOMF ¶118 [120].

### F. Resignations from USI

Sharma set the date for Maldonado and the Andersons to resign from USI and begin working at Lockton as December 9, 2019. PSOMF ¶123 [120]. Sharma was aware that the Andersons were required to provide USI with sixty-days' notice prior to terminating their employment and was likewise aware that they would not be providing that contractually required notice. PSOMF ¶¶124, 127 [120]. Taylor Anderson's decision to resign without providing sixty-days' notice to USI was made after discussions with Lockton and Hall. PSOMF ¶¶128, 130 [120]. Taylor Anderson knew of the December 9, 2019 date as early as December 2, 2019 when he had discussions with Lockton about preparing his business cards. PSOMF ¶131 [120]. Maldonado communicated with Sharma the evening of December 8, 2019 and immediately after he submitted his letter of resignation to USI on December 9, 2019. PSOMF ¶132 [120].

Dean Anderson, Taylor Anderson, and Maldonado each prepared a letter of resignation. PSOMF ¶133 [120]. According to Dean Anderson,  he

sought Hall's assistance regarding the resignation letter, and Hall actually created the first draft of Dean Anderson's letter. D. Anderson Dep. at 188-89 [126-1]. Taylor Anderson likewise got advice from counsel in preparing his resignation letter. T. Anderson Dep. at 168 [126-4]. And Maldonado communicated with counsel before submitting his letter as well. PSOMF ¶139 [120]. The resignation letters were tendered to USI "effective immediately" on December 9, 2019. PSOMF ¶134 [120]. The Andersons did not provide sixty-days' notice prior to submission of their resignations. PSOMF ¶135 [120].

USI contends that because the Andersons failed to provide the required sixty-days' notice, they remained USI employees until February 7, 2020. PSOMF ¶137. Lockton disputes the characterization of the Andersons as remaining employed with USI despite their resignations that were "effective immediately." *See* Def.'s Resp. to the Plt.'s Stmt. of Material Facts ¶137 [136].

### G. Departure Emails

Before submitting their resignation letters, Maldonado and the Andersons sent emails to clients and others outside of USI informing recipients of their imminent departure ("Departure Emails"). PSOMF ¶¶140, 141 [120]. The Departure Emails were drafted with the assistance of counsel. Def.'s Resp. to Plt.'s Stmt. of Material Fact ¶143 [136] (incorporating by

reference the response of Maldonado and the Andersons from *Anderson v. USI*, No. 1:19-CV-5582-SCJ, Plt's. Resp. to Def.'s Stmt. of Material Facts ¶85 [254]).

### H. Arrival at Lockton and Lawsuit Against USI

Lockton had workspaces ready for Maldonado and the Andersons on December 9, 2019. PSOMF ¶126 [120]. They reported to Lockton's Atlanta, Georgia office on the same day they submitted their resignations to USI. PSOMF ¶149 [120]. After arriving at the Lockton offices, Maldonado and the Andersons updated their respective LinkedIn accounts to announce they were now affiliated with Lockton. PSOMF ¶144 [120]; Maldonado Dep. at 178 [126-6]; D. Anderson Dep. at 211 [126-1]; T. Anderson Dep. at 182 [126-4]. Their new job titles were listed as follows: Dean Anderson "Senior Vice President & Aviation Practice Leader at Lockton Companies SE Series;" Roger Maldonado "Senior Vice President, Producer at Lockton Companies;" and Taylor Anderson "Senior Vice President, Defense & Aerospace at Lockton Companies." PSOMF ¶¶145, 146, 147 [120].

Lockton began paying the Former Employees' salaries on December 9, 2019 and has done so continuously since then. PSOMF ¶150 [120]. Except for medical leave taken by Dean Anderson from April to August 2020, all three have worked at Lockton since that date. *Id.*

According to USI, the Former Employees have been working in capacities that are directly competitive to the business of USI. First Allen Decl. ¶42 [131-1]. USI further contends that Dean Anderson provides the same services at Lockton that he did at USI and that his two positions were "substantially similar." First Allen Dec. ¶¶15, 20, 40 [131-1]. Dean Anderson works for Lockton in Charlotte, North Carolina. PSOMF ¶154 [120]. However, during his first week of employment with Lockton, he attended orientation at the Lockton Atlanta office. D. Anderson Dep. at 138 [126-1].

## I. Related Action

On the day after the Former Employees resigned their positions with USI, they filed a lawsuit against USI in the Superior Court of Fulton County, Georgia; USI removed the action to this Court. PSOMF ¶148 [120]; *Anderson v. USI Insurance Services LLC*, No. 1:19CV-5582-SCJ (Dec. 11, 2019 N.D. Ga.). The Former Employees requested a declaratory judgment as to the enforceability of specific restrictive covenants in their employment agreements with USI and sought temporary and permanent injunctions preventing USI from enforcing the restrictive covenants. *Id.* USI brought counterclaims against the Former Employees asserting claims for breaches of the various restrictive covenants and common law fiduciary duty.

On July 21, 2020, this Court granted motions by the parties in the Related Action and the instant action to consolidate the cases pursuant to Federal Rule of Civil Procedure 42 for purposes of discovery and trial [15]; Related Action at Doc. No. 143. Due to the limitations of the CM/ECF system, each case maintained its respective civil action numbers, but the parties were permitted to file documents in both cases using a caption including both civil action numbers. *Id.*

### J. **USI Clients Moving to Lockton**

On December 10, 2019, Dean Anderson had a phone conversation with Jennifer Guthrie, owner of In-Flight Crew Connections, LLC ("ICC"), a client of USI. PSOMF ¶156 [120]. Seven days later, USI received a broker of record ("BOR") letter from ICC stating that it was moving its account from USI to Lockton. PSOMF ¶¶166, 253 [120]. In January 2020, Guthrie texted Dean Anderson with a request that he review a contract; he told her that he could not conduct business in Georgia but provided her with Taylor Anderson's email address. PSOMF ¶168 [120]. At some point, Dean Anderson met with Guthrie and ICC's general counsel, Irena Leigh, in Charlotte to review contracts. PSOMF ¶169 [120]. While at USI, Taylor Anderson was in charge of the ICC account. PSOMF ¶251 [120]. After leaving USI for Lockton, Taylor Anderson received a text from Leigh in response to his Departure Email.

PSOMF ¶252 [120]. Taylor Anderson recalls an exchange with Leigh in which she asked for appropriate contacts at Lockton to discuss the ICC account. T. Anderson Dep. at 239 [126-4]. Taylor Anderson directed Leigh to run all account dialog through Sharma who, Taylor told Leigh, would be prepared for her call. PSOMF ¶252 [120].

While employed with USI, Dean Anderson worked with Floats and Fuel Cells, Inc. ("FCC"), another USI client. PSOMF ¶170 [120]. After joining Lockton, Dean Anderson communicated with FCC. PSOMF ¶171 [120]. On March 16, 2020, USI received a BOR letter from FFC stating that it was moving its account from USI to Lockton. PSOMF ¶172 [120].

Within the sixty-day time period provided by the Notice Provisions of the DA Agreement and TA Agreement, the following USI clients switched their business from USI to Lockton: Brightwater Capita, Arista Aviation, ICC, Rally Point Management, Tenax;,Fulcrum Concepts LLC, SouthWind, Genesys, Field Aerospace, S3, Dowe Gallagher Aerospace LLC, Rampart Aviation LLC, AirScan, US Aviation Training Solutions, Inc., and Overseas Aircraft Support, Inc. PSOMF ¶269 [120].

### K. Marchisotto's Email Communication with Tenax

Matthew Marchisotto is an employee of USI who lives in New York and had limited interaction with Dean Anderson prior to his departure for

Lockton. PSOMF ¶274 [120]. This limited interaction concerned a client of Marchisotto's who needed aviation insurance. *Id.* In January 2020, having heard of the Former Employees' departure, Marchisotto called USI's Atlanta office regarding who would assist with the renewal of his client's aviation insurance. PSOMF ¶275 [120]. During this call, Marchisotto learned that Tenax, a former USI client, had left USI and followed the Former Employees to Lockton. PSOMF ¶276 [120]. Marchisotto had a high school friend, Anthony Adler, that worked at NTC Group, the private equity firm that owned Tenax. PSOMF ¶277 [120]. Marchisotto offered to have a conversation with Adler in an effort to get Tenax to come back to USI. Marchisotto Dep. at 42 [98-1]. Before contacting Adler, Marchisotto learned of the litigation between USI and the Former Employees and was told that a court had entered an injunction. PSOMF ¶279 [120]; Marchisotto Dep. at 41-42 [98-1].

On January 16, 2020, Marchisotto sent an email to Alder that stated in part:

> These individuals [the Former Employees], like all USI employees, have employment agreements that, among other things, prohibit them for a period of 2 years from soliciting former clients that they serviced at USI. USI has gone to Federal Court and obtained an injunction that prohibits them from servicing the Tenax account along with the few other accounts that they attempted to take with them.

PSOMF ¶280 [120]. Marchisotto testified that when he sent the email, he had not read the TRO; instead, he had heard from USI personnel in Atlanta that there was an injunction and he "assumed injunction means you can't work" and "that means you're not permitted to work on an account." PSOMF ¶281 [120]. Thus, according to Marchisotto's deposition testimony, he assumed that the Court's injunction meant that Taylor and Dean Anderson could not work on the Tenax account. *Id.* Marchisotto further testified that when he wrote the email, "I wrote down what I believed was correct," that he tried to be truthful, and that he believed everything in the email was true. Marchisotto Dep. at 109 [98-1].

Marchisotto testified that after learning about the litigation and the injunction, he suggested to USI's Atlanta office personnel that he could contact Adler and explain the situation. Marchisotto Dep. at 38 [98-1]. Marchisotto further testified that his suggestion was accepted. Marchisotto Dep. at 39 [98-1].

Adler forwarded Marchisotto's email to a colleague who ultimately forwarded it to Tim Cantrell, Chief Financial Officer of Tenax. PSOMF ¶284 [120]. Cantrell testified that the email did not cause him any concern and that he believed Tenax was still eligible and allowed to continue doing business with Lockton and Taylor Anderson and Roger Maldonado. Cantrell

Dep. at 89, 101 [108-1]. Cantrell also testified that that he considered the email a nuisance because it consumed time and required Tenax to engage counsel. Cantrell Dep. at 94-95 [108-1]. Cantrell does concede, however, that Tenax reached an indemnification agreement with Lockton to pay attorney's fees related to the lawsuit. Cantrell Dep. at 102-03 [108-1]. Tenax first retained outside counsel prior to the Marchisotto email in order to respond to a subpoena in the Related Action. Cantrell Dep. at 96 [108-1].

## II.     Claims Asserted by the Parties

In the complaint [1], USI set forth three tortious interference with contractual and business relations claims. First, USI alleged that Lockton engaged in wrongful and malicious conduct designed to induce Dean Anderson and Taylor Anderson to breach the Notice Provisions and the Duty of Loyalty Provisions of their employment agreements (Count One). Next, USI alleged that Lockton engaged in wrongful and malicious conduct designed to have Maldonado and the Andersons breach their Non-Compete Covenants, Client Non-Compete Covenants, and Non-Solicitation Covenants (Count Two). Finally, USI alleged that Lockton wrongfully and maliciously raided USI's Aviation Practice Group. USI sought compensatory damages, punitive damages, and attorney's fees. USI has moved for partial summary judgment as to liability on Counts One and Two [119]. Lockton, on the other

hand, has moved for summary judgment as to all three claims against it [116].

In its counterclaims [11], Lockton set forth two substantive claims against USI. The first was for tortious interference with contractual and business relations based on USI's alleged false and misleading statements about Lockton's ability to service its customers. The second was for deceptive trade practices pursuant to O.C.G.A. § 10-1-370, *et seq*., based on the same allegations of false and misleading statements by USI regarding Lockton's ability to service its customers. Lockton sought injunctive relief as well as compensatory damages, punitive damages, and attorney's fees. On March 10, 2021, this Court dismissed the counterclaim for deceptive trade practice as well as the claim asserting tortious interference with business relations and the tortious interference with contractual relations claim to the extent that it was based on USI attorney communications [81]. As a result, the remaining counterclaim is for tortious inference with contractual relations based on communications by USI employee Marchisotto concerning Lockton client Tenax. USI moved for summary judgment as to this remaining counterclaim as well as the claims for punitive damages and attorney's fees [119].

## III.  Legal Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgement if the movant shows that there is no genuine dispute as to any material act and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden can be discharged either by showing an absence of evidence to support an essential element of the nonmoving party's case or by showing that the nonmoving party will be unable to prove their case at trial. *Celotex*, 477 U.S. at 325; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In determining whether the moving party has met this burden, the Court must consider the facts in the light most

favorable to the nonmoving party. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id*. All reasonable doubts, however, are resolved in the favor of the nonmoving party. *Fitzpatrick*, 2 F.3d at 1115. In addition, the Court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## IV.   Discussion

### A. USI's Claims

#### 1. Lockton's Motion for Summary Judgment

Lockton argues that it is entitled to summary judgment on all three of USI's claims because USI has no evidence that Lockton acted improperly and without privilege.[3] USI, on the other hand, argues that it is entitled to partial

---

[3] Lockton further argues that Maldonado and the Andersons did not breach any contract with USI and USI has suffered no cognizable damages related to

summary judgment as to Counts One and Two because the undisputed evidence establishes that Lockton induced the Andersons to violate the Notice Provisions and Duty of Loyalty Provisions contained in their employment agreements as well as their common law duties of loyalty and fiduciary duties. As to Count Three—the claim for raiding—USI argues there is evidence from which a factfinder could conclude that that Lockton sought to destroy USI's aviation insurance capabilities and form its own aviation group, and to this end, persuaded a substantial number of USI employees to leave USI en masse to join Lockton resulting in a significant drop in USI's aviation-related revenue.

The parties agree that

"[t]ortious interference claims, whether asserting interference with contractual relations [or] business relations, . . . share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or their parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.").

---

the alleged breaches. As set forth in this Court's contemporaneous ruling on the Former Employees' Motion for Summary Judgment in the Related Action, Maldonado and the Andersons are not entitled to summary judgment on those grounds. Similarly, Lockton cannot prevail on its motion on the same grounds.

*Gordon Document Prod., Inc. v. Serv. Techs., Inc.*, 308 Ga. App. 445, 449, 708 S.E.2d 48, 53 (2011). They disagree, however, as to what constitutes "improper or wrongful conduct."

In support of its motion for summary judgment, Lockton contends there is an absence of evidence of any improper actions or conduct by Lockton that could be considered wrongful in itself. Lockton is correct that with respect to the first element of tortious interference, Georgia courts have held, "Improper actions constitute conduct wrongful in itself; thus, improper conduct means wrongful action that generally involve[s] predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions.'" *Disaster Servs., Inc. v. ERC P'ship*, 228 Ga. App. 739, 492 S.E.2d 526, 529 (1997) (quoting *Am. Bldgs. Co. v. Pascoe Bldg. Sys.*, 260 Ga. 346, 392 S.E.2d 860 (1990)). The Georgia Court of Appeals has even held that for the improper action or wrongful conduct element, a "[p]laintiff must show more than that the defendant simply persuaded a person to break a contract." *Kirkland v. Tamplin*, 285 Ga. App. 241, 244, 645 SE.2d 653, 656 (2007).

In response, however, USI points to this Court's determination that the "list of improper actions is not exhaustive, as Georgia courts have found other types of conduct sufficiently wrongful to impose liability for tortious

interference." *Walker v. Select Portfolio Serv. Inc.*, No. 1:16-CV-3401-SCJ, 2017 WL 9516599, at *2 (N.D. Ga. Aug. 10, 2017) (citing *Carroll Anesthesia Assocs., P.C. v. AnestheCare, Inc.*, 234 Ga. App. 646, 507 S.E.2d 829 (1998) (finding an actionable tort where a new employer induced and encouraged employees to breach valid restrictive covenants they had with their former employer.))

The *Carroll Anesthesia* case is factually similar to the instant case in the following respects:

- Employees of Carroll Anesthesia had employment agreements containing post-employment covenants prohibiting the employees from competing for a period of time within a geographic area.

- Business competitor AnestheCare hired four of these employees and executed indemnity agreements with each of them.

- The restrictive covenants contained in the Carroll Anesthesia employment agreements were discussed during the recruitment process with AnestheCare.

- The employees knowingly breached the covenants contained in the Carroll Anesthesia employment agreements, relying on the indemnity agreements and advice of AnestheCare's counsel that the restrictive covenants were unenforceable.

- When Carroll Anesthesia began litigation to enjoin the employees from continuing to breach the restrictive covenants, AnestheCare provided them legal representation.

*Carroll Anesthesia Assocs., P.C. v. AnestheCare, Inc.*, 234 Ga. App. 646, 647-48, 507 S.E.2d 829, 832 (1998). The trial court granted summary judgment in favor of AnestheCare, but the decision was reversed on appeal. In its opinion, the Georgia Court of Appeals held that a plaintiff, in order to establish a cause of action for wrongful interference with contractual relations, must show that the defendant: (1) acted improperly and without privilege; (2) acted purposely and maliciously with the intent to injure; (3) induced a third party not to enter into or to continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury. *Id.* (citing *Lake Tightsqueeze, Inc. v. Chrysler First Fin. Svcs. Corp.*, 210 Ga. App. 178, 181, 435 S.E.2d 486, 488-89 (1993)). Notably, the Georgia Court of Appeals added the "existence of a valid contract" to the elements of interference set forth above. *Carroll Anesthesia,* 234 Ga. App. at 647-48, 507 S.E.2d at 832. In other words, it mattered to the court that the defendant induced and encouraged the former employees to breach <u>valid restrictive covenants</u>.

Lockton argues that the *Carroll Anesthesia* case applies only to the second element of tortious interference: malice. Thus, according to Lockton, to

34

establish the first element of tortious interference, USI must demonstrate

"improper conduct" which is "wrongful action that generally involves

predatory tactics such as physical violence, fraud, or misrepresentation,

defamation, use of confidential information, abusive civil suits, and

unwarranted criminal prosecutions." *Gordon Doc. Prods., Inc. v. Serv.*

*Technologies, Inc.*, 308 Ga. App. 445, 449, 708 S.E.2d 48, 53 (2011). Even if

this general list of potential wrongful acts could be considered exhaustive,

which is clearly not the case, Lockton ignores the fact that in *Gordon*, the

court found the restrictive covenants at issue to be unenforceable. With

respect to the restrictive covenants at issue here, this Court's order on the

pending Motions for Summary Judgment in the Related Case (entered

contemporaneously with this order) holds that the provisions are enforceable.

Therefore, the determination of whether there is improper conduct must be

made in the context of enforceable restrictive covenants.[4]  Moreover, the

---

[4] The only case cited by Lockton in which a court found an absence of
wrongful conduct even when an enforceable restrictive covenant was
breached is *Coloplast Corp. v. Am. Breast Care, L.P.*, 209 F. App'x 945, 946
(11th Cir. 2006). In *Coloplast*, the trial court granted summary judgment in
favor of the new employer, finding that the fair competition privilege
protected the challenged actions. The Eleventh Circuit, in a short,
unpublished opinion affirmed the grant of summary judgment. The Eleventh
Circuit's "unpublished opinions are not considered binding precedent," and
carry only "persuasive authority." 11th Cir. R. 36-2. This Court respectfully
disagrees with the opinion in *Coloplast*.

Georgia Court of Appeal has held that "persuading practically the entire sales force of the plaintiff, upon which it depends for its livelihood, to leave the plaintiff en masse and join a competing firm" is wrongful—even when those employees are purely at will.[5] *Architectural Mfg. Co. of Am. v. Airotec, Inc.*, 119 Ga. App. 245, 248, 166 S.E.2d 744, 746 (1969).

The summary judgment ruling and subsequent reconsideration in *Iterra International, LLC v. Al Khafaji*, No. 1:16-CV-1523-MHC, 2019 WL 13023738 (N.D. Ga. Oct. 24, 2019) is instructive. In granting summary judgment in favor of the defendant, the *Iterra* court held that "[s]imply persuading someone to breach a contract, absent predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, and abusive civil suits, is not improper conduct that constitutes a tortious interference with contractual relationships." *Id.* at *14 (quoting *Mathew Focht Enters., Inc. v. Lepore*, No. 1:12-CV-4479-WSD, 2013 WL 4806938, at *7 (N.D. Ga. Sept. 9, 2013)). The plaintiff in *Iterra* moved for

---

[5]  Dean Anderson and Taylor Anderson were not "purely at will" employees. While provisions in their employment agreements label them at-will employees, the Notice Provisions of the Anderson's agreements place a limit on when they may terminate their employment, *i.e.*, sixty days after giving notice.

reconsideration, arguing that where there is a valid employment agreement with an enforceable restrictive covenant, wrongful conduct can be shown by any unauthorized interference or interference without legal justification or excuse. *Id.* The court agreed, granted the motion for reconsideration, and denied the defendant's motion for summary judgment because there was evidence from which a factfinder could conclude that the defendant induced an employee to breach an enforceable employment agreement by soliciting customers he serviced. *Id.*

Here, Lockton did much more than the defendant in *Iterra*: while aware of the employment agreements, Lockton directly induced the Andersons and Maldonado to breach multiple provisions of their agreements plus provided them legal counsel and indemnity with regard to any legal challenges they faced from USI. Accordingly, Lockton is not entitled to summary judgment on USI's claims against it based on an absence of evidence of improper conduct.

Alternatively, Lockton contends it is entitled to summary judgment on USI's claims based on the fair competition privilege. Under Georgia law, fair competition is always legal. *Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1353 (N.D. Ga. 2017). "When the competitor solicits employment applications that the [competing employer]'s at-will employees respond to, this . . . is a matter of fair competition." *Am. Bldgs. Co. v. Pascoe Bldg. Sys., Inc.*, 260 Ga. 346,

348-49, 392 S.E.2d 860, 863 (1990). But, Georgia courts recognize "limits to the kinds of inducement [of at-will employees] which may be permitted . . . [and have] adopt[ed] the theory of privilege as set out in the Restatement, Torts, § 768, including the limitations upon which the privilege rests."[6] *Orkin Exterminating Co. v. Martin Co.*, 240 Ga. 662, 667, 242 S.E.2d 135, 139 (1978); *see E.D. Lacey Mills v. Keith*, 183 Ga. App. 357, 363, 359 S.E.2d 148, 155 (1987). More to the point, the Georgia Court of Appeals has held that when a competing business induces an employee to leave the competitor

---

[6] Section 768 (1) of the Restatement of Torts explains the privilege of a competitor as follows:

> One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if
> (a) the relation concerns a matter involved in the competition between the actor and the competitor, and
> (b) the actor does not employ improper means, and
> (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and
> (d) the actor's purpose is at least in part to advance his interest in his competition with the other.

However, subsection 2 adds this limitation:

> The fact that one is a competitor of another for the business of a third person does not create a privilege to cause the third person to commit a breach of contract with the other even under the conditions stated in Subsection (1).

without giving the notice required by the employee's contract, there can be no privilege. *Witty v. McNeal Agency, Inc.*, 239 Ga. App. 554, 561, 521 S.E.2d 619, 628 (1999).

Additionally, USI has alleged that Lockton attempted to raid its aviation group by seeking to hire away a significant number of its employees and did, in fact, hire five of them (Count Three). Georgia courts have held that when a competitor solicits a substantial portion of the competing business's sales force and is successful in hiring several of those employees, there is a question of fact regarding whether the fair competition privilege applies. *See Nager v. Lad'n Dad Slacks*, 148 Ga. App. 401, 404, 251 S.E.2d 330, 333 (1978). Therefore, if USI prevails in opposing Lockton's Motion for Summary Judgment as to its raiding claim, the evidence of wrongdoing it has adduced in support of the that claim would be sufficient to at least create a question of fact as to whether the fair competition privilege applies. In other words, if Lockton is not entitled to summary judgment as to Count Three, it cannot obtain it based on the fair competition privilege either.

In opposing Lockton's Motion for Summary Judgment, USI points to the following evidence:

- At some point prior to the Former Employees' departure for Lockton, the USI Aviation Practice Group had ten employees; Dean Anderson

was the leader of the Group. Plt.'s Stmt. of Additional Facts ("PSOAF")

¶¶4, 274 [143].

- Taylor Anderson was not technically a member of USI's Aviation

  Practice Group, but he worked closely with members of the Group and

  helped service USI's Client Accounts with aviation insurance needs.

  PSOAF ¶30 [143].

- In the Fall of 2019, Lockton did not have a group focused on aviation

  insurance. PSOAF ¶275 [143].

- From June 2019 through December 2019, Lockton reached out to the

  following USI employees about accepting a job at Lockton:

  -On June 4, 2019, Manoj Sharma, Executive Vice President

  and Chief Operating Officer of Lockton, contacted Taylor

  Anderson via text message to discuss potential employment

  at Lockton. PSOAF ¶57 [143].

  -Sharma contacted Roger Maldonado via telephone to

  discuss potential employment with Lockton in Summer

  2019. PSOAF ¶89 [143].

  -On October 11, 2019, Sharma contacted Dean Anderson

  via telephone to discuss potential employment with

  Lockton. PSOAF ¶74 [143].

-In October 2019, Amira Couch, Account

Representative within the USI Aviation Group,  was

contacted by a recruiter about joining Lockton.

PSOAF ¶276a [143]; Couch Dep. at 66-68 [150-12].

-On November 21, 2019, USI employee Rikin Patel

was contacted by a recruiter about joining Lockton.

PSOAF ¶276b; Patel Dep. at 88 [96-1].

-On December 5, 2019, USI employee Kimberly Grier

was contacted by a recruiter about joining Lockton.

PSOAF ¶276c[143; Grier Dep. at 79 [97-1].

- According to Couch, once members of USI's aviation practice learned

  that the Former Employees were going to Lockton, all but one reported

  contact by a Lockton recruiter. Couch Dep. at 91 [150-12]

- Of the ten USI employees that Lockton recruited, five of them left USI

  for Lockton PSOAF ¶277 [143].

- When Lockton's recruiter contacted Grier on December 5, 2019, the

  recruiter told Grier that that if she took the job, she would be working

  with someone she knew. Grier Dep. at 110 [97-1].

- Lockton offered to make the change in employment for the Former

  Employees risk-free by offering to fully indemnify them for any

judgments, fees, or costs associated with any litigation with USI about their breach of the USI Employment Agreements. PSOAF ¶¶61, 65, 80, 84, 96 [143].

- Both Rikin Patel and Kimberly Grier obtained counsel through Lockton. Grier Dep. at 93-94 [97-1]; Patel Dep. at 122-22 [96-1].

- Lockton and its counsel also directed the strategy and provided substantial support to the Former Employees pre-resignation regarding planning their simultaneous departure dates and advice about resignation letters and notices to USI's client of their departures. PSOAF ¶¶123, 126, 138-143 [143].

- Lockton's counsel also assisted Patel and Grier with their resignation notifications, preparing the initial draft of Patel's resignation letter and providing Grier assistance with her resignation email. PSOAF ¶280 [143].

- Dean Anderson told Couch that "USI wants to dismantle the aviation group." PSOAF ¶281 [143].

- In October 2019, after a Lockton recruiter contacted Couch about a position at Lockton, she told Dean Anderson about the recruiter calling her and told him that she was not interested. PSOAF ¶282 [143].

- Couch related Dean Anderson's response as follows: "I appreciate your loyalty, but I can't make any guarantees as far as what's going to happen with our practice group. So if you have a family to look after, to worry about, you have to look out for yourself. So if there is an opportunity or a recruiter contacts you, you may want to consider calling them back." PSOAF ¶283 [143].

- At the same time Dean Anderson was advising Couch, he was discussing his move to Lockton. PSOAF ¶¶75-81 [143].

- Between December 9, 2019 and February 12, 2020, at least 19 USI clients transferred their brokerage relationships away from USI to Lockton with a combined revenue in the 12 proceeding months totaling $1,082,178. PSOAF ¶271 [143].

- USI's 30(b)(6) deponent testified that although damages are continuing to accrue, USI lost at least 25 USI Client Accounts as a result of the Former Employees' breaches with estimated annual revenue totaling $1,466,821. Allen Dep. at 155 [101-1]; Ex. 31 [100-1 at CM/ECF pages 188-89].

In light of this evidence, the Court cannot conclude that there is no factual evidence to support USI's raiding claim. Rather, this evidence is sufficient to create a question of fact with respect to Count Three of the Complaint.

Therefore, Lockton cannot rely on privilege to obtain summary judgment on Counts One and Two. As a result, Lockton's motion for summary judgment is DENIED in its entirety.

### 2. USI's Motion for Summary Judgment as to Liability

Having determined that there is at least a question of fact as to USI's claims against Lockton, the Court turns to USI's Motion for Summary Judgment as to liability on Counts One and Two. In so doing, the Court will make all inferences and view all evidence in the light most favorable to Lockton as the non-movant.

In responding to USI's Motion for Summary Judgment, Lockton contends there is an absence of evidence of improper or wrongful conduct. However, as set forth above, there is evidence from which a factfinder could conclude that Lockton induced the Former Employees to breach enforceable provisions within their employment agreements with USI—which is sufficient to satisfy the element of wrongful conduct. *See supra* Part IV.A(1). Nevertheless, Lockton, as the non-movant, is entitled to favorable construction of evidence and all reasonable inferences. Thus, to prevail on its affirmative Motion for Summary Judgment, USI must establish that the factfinder could only find in its favor with respect to Counts One and Two. While USI characterizes its evidence as strong, there remain fact issues as to

whether the conduct by Lockton was wrongful and even more so with regard to Lockton's intent. In other words, this is not a case where Lockton, as the competing business, undertook actions that were wrongful as a matter of law and has conceded its intent was to injure USI. Therefore, these issues are for the factfinder, not the Court. Accordingly, USI is not entitled to summary judgment as to Counts One and Two.

**B.  Lockton's Counterclaim**

USI has moved for summary judgment on Lockton's remaining counterclaims. Those claims are for tortious interference with contractual relations based on an email sent by USI employee Matthew Marchisotto and for punitive damages and attorney's fees.

### 1. Marchisotto Email

First, USI contends that the Marchisotto email  is not of the type of wrongful actions that give rise to a tortious interference claim because at the time he sent the email, Marchisotto believed everything he said was true.[7] In response, Lockton points to Marchisotto's testimony in which he says that he

---

[7] The evidence for Marchisotto's belief is his own testimony. Lockton is entitled to challenge the credibility of this testimony, and whether it is deemed credible is for the factfinder, not the Court. Therefore, USI can not prevail on its Motion for Summary Judgment based on this this evidence alone.

learned of the litigation against the Former Employees and the existence of

an injunction from USI personnel in Atlanta, and it was those same

employees who agreed to Marchisotto's suggestion that he contact Adler.

Marchisotto Dep. at 41-42 [98-1]. Furthermore, Marchisotto conceded that he

contacted Adler for the purpose of alerting Tenax that the injunction would

present problems for Tenax in dealing with the Former Employees at Lockton

with the ultimate goal of getting Tenax to leave Lockton and return to USI.

Marchisotto Dep. at 42, 44-46 [98-1]. Thus, there is evidence from which a

factfinder could determine that USI—while fully knowledgeable about the

contents of the injunction—utilized Marchisotto to suggest to Adler that the

injunction prohibited Tenax from working with the Former Employees at

Lockton, which is undisputedly an inaccurate representation of the

requirements of the injunction. Making a false statement to induce a breach

of contract amounts to an act wrongful in itself. *DS Waters of America v.*

*Fontis Water, Inc.*, No. 1:10-CV-0335-SCJ, 2012 WL 12873620, at *3 (N.D.

Ga. Dec. 4, 2012). Georgia courts have held that even a representation that is

not knowingly false made without confirming its veracity can amount to

fraud. *See Lafontaine v. Alexander*, 343 Ga. App. 672, 676-77, 808 S.E.2d 50,

54 (2017).[8]  Therefore, there is a question of fact with regard to the wrongful conduct element of Lockton's tortious interference with contractual relations claim.

Second, USI contends that the Marchisotto email is entitled to privilege under O.C.G.A. § 51-5-7(3), which protects "[s]tatements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned." In response, Lockton points out that Marchisotto is not the party against whom the tortious interference claim is made; that party is USI. Furthermore, Lockton has adduced evidence that USI personnel in Atlanta were involved in the concept, if not the precise content, of Marchisotto's email. Thus, the good faith intent inquiry does not focus solely on Marchisotto. Accordingly, his testimony that he believed what he wrote was true, even if it could be deemed credible by the Court, is not sufficient to allow USI to prevail on its summary judgment motion. As stated above, there is evidence from which a factfinder could determine that Marchisotto's relationship with Adler was exploited by other USI employees

---

[8] USI correctly points out that *Lafontaine* is not a tortious interference case. Nevertheless, fraud and misrepresentation are within the list of specific actions that are recognized as wrongful conduct for purposes of tortious interference with contractual relations. *Gordon Document Prod., Inc. v. Serv. Techs., Inc.*, 308 Ga. App. 445, 449, 708 S.E.2d 48, 53 (2011).

in an effort to regain Tenax as a client through statements that, as USI acknowledges, were not precisely accurate.

USI's third argument is that it is entitled to summary judgment as to the malice element of Lockton's tortious interference claim. Again, USI relies on Marchisotto's testimony that he believed that all statements in his email were truthful. This narrow view of the communication fails for the same reasons discussed above: there is evidence from which a factfinder could determine that USI employees other than Marchisotto urged the communication knowing that it was not precisely accurate.

Fourth, USI contends there is no evidence that the Marchisotto email rendered Lockton's performance of the Tenax contract more difficult or expensive. In response, Lockton points to the testimony of Tenax's Chief Financial Officer, Tim Cantrell, who expressed frustration with being drawn into a squabble between USI and the Former Employees. Cantrell Dep. at 95 [108-1]. Further, Tenax viewed the situation as a nuisance, and it was required to engage counsel. *Id.* at 94-95 [108-1]. After informing Lockton of the situation, Lockton agreed to indemnify Tenax for any legal costs. *Id.* at 102-03 [108-1]. This evidence is sufficient for a factfinder to determine that the Marchisotto email made Lockton's performance of the contract with Tenax more difficult or expensive.

Finally, USI argues that there is no evidence that Lockton suffered any financial injury that was proximately caused by the Marchisotto email. In response, Lockton points to its agreement to pay Tenax's legal fees. *Id.* at 102-03 [108-1]. While USI claims that the indemnification agreement occurred months after the email was sent and stemmed from subpoenas unrelated to the email, the court finds there is at least a question of fact as to whether the Marchisotto email contributed to Lockton's decision to indemnify Tenax for legal fees related to USI's counterclaims against the Former Employees in the Related Action.

## 2. Punitive Damages & Attorney's Fees

USI argues that because it is entitled to summary judgment on Lockton's tortious interference claim, the derivative claims for punitive damages and attorney's fees must fail. As set forth above, however, there remain questions of fact as to the elements of the tortious interference claim. Accordingly, USI is not entitled to summary judgment on the claims for punitive damages and attorney's fees.

## V.    Conclusion

For the above-mentioned reasons, Lockton's Motion for Summary Judgment [116] is DENIED, and USI's Motion for Partial Summary Judgment [119] is DENIED. Furthermore, Lockton's Motion for Leave to File

Supplemental Authority [169] is GRANTED,[9] and USI's Motion for Leave to

File a Surreply [172] is GRANTED

This case is REFERRED to the next available magistrate judge, who

shall be assigned this case in the ordinary manner. With respect to the

mediation process, the parties are reminded to conduct themselves in

accordance with Local Rule 16.7, NDGa. Furthermore, the deadline for filing

the proposed consolidated pretrial order is STAYED to give the parties time

to pursue settlement. The parties are ORDERED to file, within ten days of

the mediation, a joint status report informing the court of the outcome of the

mediation. If the mediation is successful, the parties' status report shall

provide a date by which the final settlement agreement will be executed and

the dismissal filed. If the mediation is unsuccessful, the stay shall be

automatically lifted, and the proposed consolidated pretrial order shall be due

within 30 days of the date of mediation.

---

[9] In this motion, Lockton alerts the court to an October 13, 2021 decision of the Georgia Court of Appeals and contends it is applicable to the parties' cross motions for summary judgment because it involves the same types of claims at issue in the instant case, namely tortious interference claims asserted by an employer against a former employee's new company. *See BB&T Insurance Servs. Inc. v. Renno*, 331 Ga. App. 415, 864 S.E.2d 608 (2021). *Renno* is not applicable, however, because the court there expressly found the restrictive covenants in the employment agreement to be unenforceable. Here, the Court has determined that at least some of restrictive covenants are enforceable as a matter of law.

SO ORDERED, this 29th day of March, 2022.

HONORABLE STEVE C. JONES
United States District Judge